## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-cv-01387 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| JEH JOHNSON, Secretary of the U.S. | ) | |
| Department of Homeland Security; | ) | |
| LEON RODRIGUEZ, Director of | ) | |
| U.S. Citizenship and Immigration | ) | |
| Services; and NICHOLAS COLUCCI, | ) | |
| Chief of the Immigrant Investor | ) | |
| Program Office, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On June 29, 2011, the United States Citizenship and Immigration Services ("USCIS") approved Plaintiff John Doe's application for conditional permanent resident status under the Immigration and Nationality Act's visa program for aliens investing in qualified job creation projects in the United States (commonly known as the "EB-5 program").[1] On September 16, 2013, Plaintiff filed an I-829 petition to remove the conditions and become a permanent resident, but the petition was denied. Plaintiff now sues Jeh Johnson, Secretary of the U.S. Department of Homeland Security, Leon Rodriguez, Director of U.S. Citizenship and Immigration Services, and Nicholas Colucci, Chief of the Immigrant Investor Program Office

---

[1] Plaintiff was permitted to proceed anonymously in this action based upon his claim that, as a citizen of Iran, he will likely be subject to sanctions in the event that he is ordered to return to Iran.

("Defendants"), challenging that denial. His eleven-count complaint alleges that USCIS's decision was arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), exceeded its statutory and regulatory authority under 5 U.S.C. § 706(2)(C), failed to provide him with procedural due process, and violated his First Amendment rights.

The parties have filed cross-motions for summary judgment. For the reasons that follow, Defendants' motion [82] is granted, and Plaintiff's motion [78] is denied.

## Background[2]

### I.    The EB-5 Program

Under the EB-5 program, visas are specifically allocated for "qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise," where (i) the immigrant invests a set amount of capital in the enterprise, and (ii) the enterprise benefits the U.S. economy by "creat[ing] full-time employment for not fewer than 10 [qualified employees]." 8 U.S.C. § 1153(b)(5). Where an investment is made in a "targeted employment area," as in this case, the relevant amount of investment capital is $500,000. *Id.* § 1153(b)(5)(C)(ii); 8 C.F.R. § 204.6(f)(2).

To obtain a visa under the EB-5 program, an investor must proceed in two steps. First, the investor must file a "Form I-526, Immigrant Petition by Alien

---

[2]    For reasons explained in more detail below, the Court must confine its review of USCIS's decision to the administrative record. *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009). The following background draws from that record, as well as the parties' Local Rule 56.1 statements, insofar as they are properly sourced in that record.

Entrepreneur" with USCIS. 8 C.F.R. § 204.6(a). This petition must be accompanied by evidence that the investor has invested or will invest the required capital in a new commercial enterprise that meets the EB-5 program's job creation requirement. *Id.* § 204.6(j). As to the capital investment requirement, "the petition must be accompanied by evidence that the [investor] has placed the required amount of capital at risk for the purpose of generating a return." *Id.* § 204.6(j)(2). USCIS regulations list different types of evidence that is permissible for this purpose. *Id.* As to the job creation requirement, an investor must produce evidence documenting the number of hired employees, or "[a] copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired." *Id.* § 204.6(j)(4). If USCIS approves the investor's I-526 petition, the investor is given lawful permanent resident status on a conditional basis. 8 U.S.C. § 1186b(a)(1).

Once the I-526 petition is approved, the investor may seek to remove the conditional status by filing a "Form I-829, Petition by Entrepreneur to Remove Conditions" within the ninety-day period that precedes the investor's two-year anniversary of becoming a conditional permanent resident. 8 C.F.R. § 216.6(a). In evaluating the I-829 petition, USCIS determines whether the investor (i) established a commercial enterprise, (ii) "invested or was actively in the process of investing the requisite capital," (iii) "sustained" these actions throughout the

investor's residency by "substantially me[eting] the capital investment requirement of the statute and continually maintain[ing] his or her capital investment over the two years of conditional residence," and (iv) "created or can be expected to create with a reasonable period of time ten full-time jobs to qualifying employees." *Id.* § 216.6(c).  It is the investor's burden to demonstrate these requirements by a preponderance of the evidence.  *Matter of Chawathe*, 25 I. & N. Dec. 369, 375 (BIA 2010).

If USCIS approves the I-829 petition, the investor is granted permanent residency.  On the other hand, if USCIS denies the petition, the investor's conditional permanent resident status is terminated.  8 C.F.R. § 216.6(d).

## II.    Plaintiff's EB-5 Petitions

Plaintiff is an Iranian national who sought to achieve lawful permanent residency through the EB-5 program by investing in a new commercial enterprise that would construct and operate an assisted living facility in Elgin, Illinois.  Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 1, 7, ECF No. 78-2; *see* Defs.' LR 56.1(a)(3) Stmt. ¶ 5, ECF No. 82-2.  This enterprise was structured such that Plaintiff made an initial capital investment of $500,000 into the "Elgin Assisted Living EB-5 Fund, LLC" ("EALEF"), which maintained his funds in an escrow account while his I-526 petition was pending.  *See* Pl.'s LR 56.1(a)(3) Stmt. ¶ 7.  EALEF was created to pool the capital investments of twenty-four investors, generating a total of $12 million to invest in the assisted living facility.  Defs.' LR 56.1(a)(3) Stmt. ¶ 1.

USCIS approved Plaintiff's I-526 petition on June 29, 2011. *See* Pl.'s LR 56.1(a)(3) Stmt. ¶ 7. He became a conditional permanent resident shortly thereafter on October 3, 2011. Defs.' LR 56.1(a)(3) Stmt. ¶ 2. As part of his I-526 petition, Plaintiff submitted a business plan, which projected that construction of the assisted living facility would begin in 2010 and the facility would be completed and operational in 2011. *Id.* ¶ 5. Using the "RIMS II economic model,"[3] Plaintiff's business plan projected that a total of 278 direct and indirect jobs would be created by the new commercial enterprise.[4] Defs.' LR 56.1(a)(3) Stmt. ¶ 6.

On July 29, 2011, one month after USCIS approved Plaintiff's I-526 petition, EALEF transferred Plaintiff's $500,000 capital investment to Elgin Memory Care, LLC ("EMC"), which held the enterprise's operating account. Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 7–8. Three days later—on August 1, 2011—EMC purchased a piece of real estate, on which it intended to build the assisted living facility, for $1,100,000. *Id.* ¶ 13. EMC purchased the land from an entity called UIS Development, LLC ("UIS"). *Id.* Earlier on the same day, UIS had purchased the land from another entity—Nesler & Lake-CRE, LLC ("Nesler")—for only $630,000. *Id.* ¶ 11. Plaintiff

[3]     Little need be said about the RIMS II model here, other than that the model "is often used to demonstrate indirect job creation" in EB-5 petitions. Pl.'s Reply & Resp. Defs.' Cross-Mot. Summ. J., Ex. 4, at 5, ECF No. 86-4.

[4]     As USCIS has explained in its EB-5 policy memorandum, "indirect jobs" are those "held outside of the new commercial enterprise but are created as a result of the new commercial enterprise." Certified Administrative Record ("CAR") at 64, ECF No. 33-1. By contrast, "direct jobs" are held as part of the new commercial enterprise. As we will see, Plaintiff sought only to rely on the creation of indirect jobs in support of his I-829 petition. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 12, ECF No. 86-8.

maintains that EMC used his capital investment to purchase the land from UIS. *See* CAR at 8, ECF No. 32-1; Pl.'s Reply & Resp. at 23, ECF No. 86.

The projections in the business plan that Plaintiff submitted with his I-526 petition proved to be grossly inaccurate. Construction was severely delayed as EMC sought zoning, architectural, engineering, and landscaping approval. Pl.'s LR 56.1(a)(3) ¶ 15. Ultimately, EMC did not receive a final construction permit for the facility until October 6, 2014. *Id.* ¶ 20. As of October 2014, no structures had been built on the site of the facility. *Id.* ¶ 23. Plaintiff maintains that EMC had "beg[un] its site work" by that time, including the "installation of [a] sanitary sewer system[] and demolition of existing buildings." *Id.* But photographs of the site that Plaintiff provided as part of his later I-829 application revealed no structures or other apparent progress in building construction. Defs.' LR 56.1(a)(3) ¶ 10; *see* CAR 2528–33, ECF No. 37-5.

Plaintiff filed his I-829 petition on September 16, 2013. Defs.' LR 56.1(a)(3) ¶ 3. On August 15, 2014, prior to ruling on Plaintiff's petition, USCIS issued a Request for Evidence ("RFE"), noting that "[b]ased upon [its] review of the initial record of evidence," USCIS "[could not] conclude that [Plaintiff] ha[d] established eligibility for removal of conditions." CAR at 12. The RFE explained that Plaintiff's I-829 petition had failed to demonstrate that he had invested and sustained the necessary amount of capital during his period of conditional permanent residency. *Id.* It specifically asked Plaintiff to provide additional details about EMC's purchase of the land, because USCIS could not determine whether his investment

"ha[d] been made available to [the enterprise] and placed at risk for the purpose of generating a return." *Id.* at 13. Specifically, the RFE requested, among other items, "[a]n explanation, with supporting evidence, to explain the prior sale between [Nesler] and [UIS]" for the land that EMC purchased, a description of the relationship among the parties, and "[a]ny other evidence deemed appropriate by [Plaintiff] to overcome the deficiencies" identified in the RFE. *Id.* at 14.

In addition to requesting evidence about Plaintiff's investment, the RFE sought evidence that he had complied with the job creation requirement (*i.e.*, that the enterprise had created or would create at least ten full-time jobs for qualifying employees). *Id.* In this regard, the RFE noted various problems with the impact reports that Plaintiff had submitted with his I-829 petition.

First, USCIS was concerned that Plaintiff was attempting to use a methodology that would permit him to take credit for indirect jobs "based on operation of the facility *and* jobs based on construction and development." *Id.* at 15 (emphasis added). This methodology was different from the one that Plaintiff had used to support his I-526 petition. *Id.* Furthermore, noting the difficulties EMC had faced in getting the facility up and running, the RFE stated that "[i]t appears that the Form I-526 may have been filed prematurely, and [Plaintiff] is now attempting to compensate for the premature filing by modifying the job creation methodology to suit the delay." *Id.* at 16. Accordingly, the RFE requested "independent objective evidence" such as "invoices, canceled checks and contracts, to substantiate the claimed spending to date on the project"; "[a] revised economic

impact analysis that properly breaks out construction soft costs from hard costs";
"[e]vidence that all regulatory approvals have been received . . . and that
construction on the project has commenced, or will commence in a timely manner";
and "[a] revised time line for completion and operation" of the facility. *Id.* at 16–17.

Plaintiff responded to the RFE with various evidence and documentation on
October 31, 2014. *Id.* at 18.

## III.    USCIS's Decision on Plaintiff's I-829 Petition

On January 16, 2015, USCIS issued its decision denying Plaintiff's I-829
petition. It concluded, "based upon a preponderance of the evidence," that Plaintiff
had not met his burden of establishing eligibility for removal of the conditions on
his permanent residency. *Id.* at 4.

USCIS offered two "independent and alternative" grounds for its denial. *Id.*
at 9. First, USCIS found that Plaintiff had failed to demonstrate that he had met
and sustained the capital investment required by the EB-5 program. *Id.* at 6. It
explained that, in order to satisfy the capital investment requirement, Plaintiff
needed to show that his capital had been "placed at risk for the purpose of
generating a return," meaning that "'the full amount of [his] money [was] made
available to the business(es) most closely responsible for creating the employment
upon which'" Plaintiff's petition was based. *Id.* at 4 (quoting *In Re Izummi*, 22 I. &
N. Dec. 169, 179 (BIA 1998)). After reviewing the record, USCIS determined that
Plaintiff had not made this showing, because he could not show that his investment
was not "simply being used for purposes unrelated to job creation." *Id.* at 6.

In arriving at this determination, USCIS focused on the land transaction, explaining that "the same-day land transaction and the doubling of the price cast doubt on the legitimacy of the transaction." *Id.* Although Plaintiff had submitted affidavits disclaiming any prior relationship among EMC, UIS, and Nesler, the agency did not consider them sufficient to explain the terms of the sale, particularly given Plaintiff's failure to provide a copy of the UIS–Nesler sales agreement or an independent appraisal of the land. *Id.* Thus, USCIS concluded that Plaintiff had not satisfied his burden to prove that his investment "was truly made available to [EMC] and placed at risk for the purpose of generating a return." *Id.* at 5–6.[5]

USCIS also determined that Plaintiff had failed to demonstrate that he had complied with the job creation requirement. *Id.* at 7–9. USCIS noted that the various business plans and employment impact reports Plaintiff had submitted provided varying estimates for the project. For example, the 2010 business plan stated that construction would commence on 2010 and the facility would be fully operational by 2011. *Id.* at 8. The revised 2011 business plan stated that the facility would be completed by 2012. *Id.* And the revised 2012 business plan stated that the facility would be completed by 2014. *Id.* USCIS observed that, as of the date of the denial, "contrary to the projections in the business plans provided by [Plaintiff], construction of the [facility] has yet to begin." *Id.* This problem was made worse, in USCIS's view, by Plaintiff's failure to provide a revised, updated

---

[5]     USCIS further noted that, based on the documentation Plaintiff provided in response to the RFE, EMC was using EB-5 investor funds to "speculate[] in mutual funds and other fixed income investments" and "as a Pledge Collateral Account," both of which would also constitute uses unrelated to job creation. *Id.* at 6–7.

timeline for the facility's completion and operation. *Id.* USCIS therefore declined to rely on the job projections in Plaintiff's impact reports. Instead, it performed its own analysis of Plaintiff's "documented expenses," finding that "[t]he only documented expenses so far are soft construction cost expenses for architectural and engineering designs, legal and accounting services[,] etc. for which total proof of payment has been provided for $736,046." *Id.* at 9. USCIS then summarized these expenses in a table and calculated that thirteen jobs—four direct and nine indirect—had been generated from those investments. *Id.* But, in light of Plaintiff's failure to "establish[] that construction will last at least two years," USCIS found that "these jobs"—without specifying whether it meant the direct jobs, indirect jobs, or both—could not be counted in Plaintiff's favor. *Id.* (citing *Spencer Enters., Inc. v. United States*, 229 F. Supp. 2d 1025, 1038–39 (E.D. Cal. 2001)).

## Legal Standard

Where a court reviews an agency decision under 5 U.S.C. § 706, it must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.[6] "The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). For this reason, "judicial review of an

---

[6] It bears noting that Plaintiff's complaint seeks nothing more than judicial review of USCIS's decision. *See* Am. Compl. ¶ 5, ECF No. 2. Plaintiff does not seek a trial, even for his claims arising under the First Amendment, for which Plaintiff requests only APA-based review. *See id.* ¶¶ 159, 169. Moreover, Plaintiff's request for a declaratory judgment, *id.* ¶¶ 180–81, seeks an order declaring USCIS's decision unlawful on the other grounds he raises.

agency's final determination follows standards quite different from those applied in a typical summary judgment proceeding." *J.N. Moser Trucking, Inc. v. U.S. Dep't of Labor*, 306 F. Supp. 2d 774, 781 (N.D. Ill. 2004). Review is based solely on the record in the administrative proceeding below, and the court does not take or consider new evidence. *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994).

Thus, "[w]hen a party moves for summary judgment in such a judicial-review proceeding, he does not implicitly reserve a right to a trial if the motion is denied; there is no right to a trial in a review proceeding, as contrasted with an original proceeding. The motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record. It informs the judge that he should resolve the case as a matter of law; that there are no triable issues of fact." *Id.* (internal citation omitted).

## Analysis

The Court first addresses Plaintiff's contentions that USCIS's decision is arbitrary and capricious under 5 U.S.C. § 706(2)(A). The Court then considers Plaintiff's claim that USCIS's decision exceeded the agency's statutory and regulatory authority under 5 U.S.C. § 706(2)(C), before turning to Plaintiff's constitutional claims.[7]

---

[7]     Defendants have not challenged the Court's jurisdiction to review USCIS's decision in the first instance. Although it is unable to find any Seventh Circuit cases on point, the Court concludes that it has jurisdiction to adjudicate Plaintiff's claims. *See Chang v. United States*, 327 F.3d 911, 922–924 (9th Cir. 2003) (holding that district court had subject matter jurisdiction to review agency's denial of an I-826 petition under the APA); *Doe v. U.S. Citizenship & Immigration Servs.*, 2017 WL 972086, Civ. Action No. 15-273 (CKK), (D.D.C. Mar. 10, 2017) (reviewing denial of I-526 petitions under the APA).

## I.    Section 706(2)(A) Challenge

Plaintiff first seeks to set aside USCIS's decision on the basis that it is arbitrary and capricious.  Under the APA, a court must set aside an agency decision where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  In determining whether an agency decision is arbitrary or capricious, a court considers "'whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment.'"  *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858–59 (7th Cir. 2003) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

The court analyzes the agency decision with a mind to whether the agency "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Id.* at 859 (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  This standard is met where "the agency's explanation is clear enough that its 'path may reasonably be discerned.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  Granted, the court must be "reluctant to license 'free-wheeling agencies [to mete] out their own brand of justice.'"  *Marozsan v. United States*, 852 F.2d 1469, 1477 (7th Cir. 1988) (alteration in original) (quoting *Ralpho v. Bell*, 569 F.2d 607, 623 (D.C. Cir. 1977)).  But the court's review is nonetheless limited to determining whether the agency "'heard and thought and [did] not merely react[]'"

to the evidence before it. *Ogbolumani v. Napolitano*, 557 F.3d 729, 735 (7th Cir. 2009) (quoting *Rashiah v. Ashcroft*, 388 F.3d 1126, 1130–31 (7th Cir. 2004)).

Plaintiff argues that USCIS, in denying his I-829 petition, acted arbitrarily and capriciously in the following ways: (1) by determining that he did not meet the EB-5 program's capital investment requirement; (2) by determining that he did not meet the EB-5 program's job creation requirement; and (3) by applying a standard of proof more rigorous than preponderance of the evidence. The Court will address each of these arguments in turn.

## A.     Capital Investment Requirement

With respect to USCIS's determination that he did not meet the EB-5 program's capital investment requirement, Plaintiff argues that USCIS incorrectly decided that he had not demonstrated the legitimacy of the transaction by which EMC acquired the facility's land. Pl.'s Reply & Resp. at 20. In so doing, Plaintiff does not challenge USCIS's reliance upon *In Re Izummi,* 22 I. & N. Dec. 169 (BIA 1998), and its requirement that the petitioner demonstrate that the full amount of his investment was "'made available to the business(es) most closely responsible for creating the employment upon which [his] petition is based.'" CAR at 4 (quoting *In Re Izummi*, 22 I. & N. Dec. at 179); *see* Pl.'s Reply & Resp. at 22.[8] Rather, Plaintiff

---

[8]     *In Re Izummi* states, in pertinent part:

> Especially where indirect employment creation is being claimed, and the nexus between the money and the jobs is already tenuous, [USCIS] has an interest in examining, to a degree, the manner in which funds are being applied.  The full amount of money must be made available to the business(es) most closely responsible for creating the employment upon which the petition is based.  [USCIS] does not wish to encourage the creation of

contends that USCIS arbitrarily and capriciously disregarded his evidence in favor of an unfounded "hunch" that the land transaction was illegitimate. Pl.'s Reply & Resp. at 21.

It is clear from the record that USCIS was deeply concerned about the legitimacy of EMC's land deal and whether Plaintiff's capital had, in fact, been used to support job creation activities by the assisted living facility. It had reason to be. Only three days after Plaintiff had deposited his capital investment in EMC's operating account, EMC purchased the property at issue. In doing so, it paid nearly double what the seller, UIS, had paid earlier *on the very same day* to purchase the property from Nesler. Based on these circumstances, the Court cannot conclude that USCIS's concern that Plaintiff's capital was diverted from job creating activities was arbitrary or capricious.

For his part, Plaintiff contends that he submitted evidence to allay USCIS's concerns about the transaction, pointing to the sworn affidavits from UIS, EALEF, and EMC officers that disclaim any relationship prior to the land deal. CAR at 486–88, 2923–24, ECF Nos. 33-9, 37-9. But USCIS was well within its rights to discount these self-serving affidavits, particularly given that they do little to shed any light on the wide disparity between UIS's and EMC's purchase prices. The lack of information was exacerbated by Plaintiff's failure to provide a copy of the UIS-

---

layer upon layer of "holding companies" or "parent companies," with each business taking its cut and the ultimate employer seeing very little of the aliens' money.

*In Re Izummi*, 22 I. & N. Dec. at 179 (footnote omitted). It bears repeating that Plaintiff does not contest the propriety of such scrutiny in his case.

Nesler sale document, the terms of the deal, or any independent appraisal of the land itself. In the end, USCIS was left only with Plaintiff's conclusory assertion that "[m]ore likely than not, UIS was able to 'flip' the parcel of land for the [f]acility and obtain a profit from it." CAR at 25. USCIS's rejection of this theory was not unreasonable.

In response, Plaintiff argues that USCIS was required to credit the affidavits save any contradictory evidence, pointing to *Soltane v. U.S. Department of Justice*, 381 F.3d 143, 151–52 (3d Cir. 2004). But *Soltane* states that "'[a]n agency's rejection of uncontradicted testimony *can* support a finding of substantial evidence,'" insofar as the agency provides adequate reasons for its rejection. *Id.* (emphasis added) (internal quotation marks and citation omitted). Here, USCIS declined to find the affidavit dispositive given Plaintiff's failure to provide objective evidence justifying the price paid for the land. CAR at 6.

Plaintiff further decries USCIS's insistence on a copy of the UIS–Nesler agreement or an independent appraisal of the land. But it was not arbitrary or capricious for USCIS to look to Plaintiff to provide some evidence that EMC's purchase price was reasonable and that his capital was put toward legitimate uses for the project. *Alaska Airlines, Inc. v. U.S. Dep't of Transp.*, 575 F.3d 750, 757–58 (D.C. Cir. 2009) (noting in a different administrative context that "one need not consult precedents to see that requiring an independent appraisal to ensure an objective determination of [fair market value] is neither arbitrary nor capricious but only a prudent acknowledgement of human nature and institutional incentives").

In any case, USCIS did not specifically require the UIS–Nesler agreement or an independent appraisal in its RFE, but invited Plaintiff to submit any objective evidence to support his claims. CAR at 14. When Plaintiff failed to do so, USCIS reasonably concluded that the remaining evidence was insufficient to show by a preponderance of the evidence that Plaintiff's capital was dedicated to job creation activities of the project.

Based upon the record, USCIS's determination that Plaintiff had not satisfied his burden of proof to demonstrate his compliance with the EB-5 program's capital investment requirement was not arbitrary and capricious.[9]

## B.    Job Creation Requirement

Plaintiff further contends that USCIS's additional, independent reason for denying his I-829 petition—failing to demonstrate compliance with the job creation requirement—was arbitrary and capricious. In doing so, he lodges three primary objections: (1) USCIS erred in refusing to give Plaintiff credit for the creation of indirect jobs lasting less than two years; (2) USCIS improperly disregarded an employment impact report indicating that $2.13 million in expenditures had been

---

[9]    Plaintiff further objects to USCIS's concern that investor funds may have been used to speculate in mutual funds and other fixed income investments, or as part of a Pledge Collateral Account. The basis for his objections, however, is merely that by the time such uses occurred, his investment had already been put toward the land deal. Pl.'s Reply & Resp. at 23–24. But USCIS had reason to suspect the legitimacy of the land deal itself. Additionally, Plaintiff points out that USCIS may have overlooked an unredacted bank statement indicating that his investment was transferred from EALEF to EMC. *Id.* at 24; *see* CAR at 7. Even if this is so, it has no bearing on USCIS's rationale for denying his I-829 petition and, therefore, was harmless. 5 U.S.C. § 706 (instructing that in reviewing agency decisions under the arbitrary or capricious standard, "due account shall be taken of the rule of prejudicial error"); *see Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 682 (7th Cir. 2016).

put toward job creation (as opposed to the $736,036 USCIS calculated); and (3) USCIS failed to indicate the methodology it used in determining how many jobs to credit Plaintiff, while at the same time improperly discounting Plaintiff's counting methodology. The Court will address each of these objections in turn.

### 1. Indirect Jobs

Plaintiff first argues that USCIS erred by precluding Plaintiff from counting indirect jobs lasting less than two years. Pl.'s Resp. & Reply at 3. But this argument reads too much into USCIS's decision. After listing documented "soft construction cost expenses" and determining that these expenses had produced four direct jobs and nine indirect jobs, USCIS concluded that, because Plaintiff had not established that construction would not continue beyond two years, "these jobs cannot be included." CAR at 9. Although USCIS did not indicate whether it meant to refer to direct jobs, indirect jobs, or both, it cited *Spencer Enterprises, Inc., v. United States*, 229 F. Supp. 2d 1025, 1038–39 (E.D. Cal. 2001). In *Spencer*, the court declined to count construction jobs toward an EB-5 investor's *direct* job quota, explaining that "[t]he described jobs to be created by [the new commercial enterprise] do not appear to qualify as permanent, full-time positions, but rather, arise when building trade skills are needed during a phase of construction." *Id.* at 1039. Accordingly, it is apparent that, when referring to "these jobs," USCIS was referring to the four direct jobs it had calculated in the table immediately prior. *See Encino*, 136 S. Ct. at 2125 (explaining that an agency gives adequate reasons for a decision when the decision is clear enough that a reviewing court can discern its

reasoning).  Thus, while Plaintiff is correct to point out that *Spencer* does not establish that indirect jobs lasting less than two years cannot count toward an investor's job creation quota under the EB-5 program, Pl.'s Reply & Resp. at 7–8, this argument misses the mark.

In any case, even if USCIS meant to suggest that Plaintiff could not take credit for indirect jobs lasting less than two years, this error would be harmless given that USCIS calculated only nine such jobs, when ten are required.  Such an error, therefore, would not warrant a finding that USCIS's decision was arbitrary and capricious.  5 U.S.C. § 706; *Zero Zone*, 832 F.3d at 682.  For these reasons, Plaintiff's first contention fails.

### 2.    Employment Impact Report

Next, Plaintiff contends that USCIS should have used $2.13 million, rather than $736,036, in calculating the number of jobs created by the project.  The $2.13 million figure was contained in an employment impact report dated September 12, 2013, listing expenditures from 2010 through August 29, 2013.  Pl.'s Reply & Resp. at 11; *see* CAR at 731–46, ECF No. 34-5.  According to Plaintiff, using this figure would have resulted in a tally of eleven indirect jobs, rather than nine.  Pl.'s Reply & Resp. at 11.  Plaintiff argues that USCIS failed to explain its rejection of the $2.13 million expenditure figure in favor of its own.[10]

---

[10]    Plaintiff also notes in passing that USCIS failed to credit him for jobs attributable to expenditures made by EMC between August 30, 2013, and October 3, 2014.  *Id.* at 12.  But Plaintiff does not identify what those expenditures were, how they were presented to USCIS, and how many jobs resulted.  Such undeveloped arguments are waived.  *See United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)) ("We have repeatedly and consistently held that

A review of the record reveals, however, that it was not arbitrary or capricious for USCIS to question the reliability of the expenditures stated in the 2013 employment impact report. As USCIS explained in its decision (and had previously stated in its RFE), the plans and reports submitted by Plaintiff contained various statements claiming that construction would have commenced by the date of the denial, but, as USCIS observed, "construction of the [facility] ha[d] yet to begin." CAR at 8–9. Plaintiff disputes this characterization, noting that construction had begun in the sense that existing buildings on the site were demolished and a sanitary system was installed. Pl.'s LR 56.1(a)(3) Stmt. ¶ 23. Be that as it may, it was not arbitrary or capricious for USCIS to question the accuracy of Plaintiff's submissions, given that the construction of the facility itself had yet to begin and the prior construction estimates in the various reports were grossly inaccurate.

Of course, as Plaintiff points out, Plaintiff was entitled to take credit for indirect jobs that were created even before the commencement of construction. Pl.'s Reply & Resp. at 17–19. But USCIS did not state otherwise. Rather, USCIS questioned the reliability of Plaintiff's evidence in light of the fact that the facility, which Plaintiff represented in his I-526 petition would be up and running by 2011, was nowhere to be seen, and Plaintiff had failed to submit any revised timeline for completion of the project. CAR at 8.

'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.'"). In any case, assuming the expenditures were not documented in the manner USCIS requested, it would not have been arbitrary or capricious for USCIS to decline to consider them for the reasons provided.

Moreover, the 2013 employment impact contains only a summary of the claimed expenditures, rather than direct evidence of those expenditures. This is an issue that USCIS warned Plaintiff about in its RFE. CAR at 16 (cautioning that "[Plaintiff] has not submitted any evidence to support the expenses used" in regard to a separate impact report). To that end, the RFE specifically requested "[e]vidence, such as invoices, canceled checks and contracts, to substantiate the claimed spending to date." *Id.*[11] To the extent that Plaintiff did submit checks, invoices, and other evidence documenting actual expenditures, USCIS used them to calculate the indirect jobs created by such funds. CAR at 9; *see* CAR at 3322–26, ECF No. 38-6 (listing Plaintiff's documented expenses). The Court cannot say that such an approach was arbitrary or capricious.

Ultimately, USCIS rejected the expenditures claimed in the 2013 employment impact report based on its determination, having considered that the report was unreliable in light of the totality of the record. Whether the Court would have come to a different conclusion if it were reviewing the record in the first instance is irrelevant here. *See Ogbolumani*, 557 F.3d at 735. The agency's

---

[11]     Similarly, while Plaintiff submitted various EMC bank statements in response to the RFE, USCIS declined to accept these as direct evidence of expenditures. Plaintiff disagrees with this decision, arguing that all outgoing funds shown on the bank statements should be considered expenditures for the purposes of calculating jobs created. Pl.'s Reply & Resp. at 13–15. But the statements do not indicate what any of the money was spent *on. See, e.g.*, CAR at 1047, ECF No. 34-10 (listing "Withdrawals and Debits" for a one-month period in September 2011 as $51,500, but not indicating what the withdrawals and debits were used for). Given the circumstances surrounding the land transaction and the construction delays, it was not arbitrary or capricious for USCIS to refuse to assume that all outgoing funds were expenditures that would have resulted in indirect jobs.

determination must be upheld so long as it is not arbitrary and capricious, and it meets the test here.

### 3. Methodology

Finally, Plaintiff argues that it is unclear what methodology USCIS used to arrive at its conclusion that the project incurred $736,036 in expenditures resulting in nine indirect jobs. He also argues that USCIS improperly questioned the job counting methodology that he used in support of his I-829 petition.

First, USCIS's decision lays out in some detail the expenditure amounts and multipliers it used in calculating the number of indirect jobs attributable to Plaintiff. CAR at 9. Moreover, these calculations simply mirror those performed by a USCIS economist as part of a due diligence summary contained in the record. *See* CAR at 3318–29. Thus, USCIS's calculations are not as mysterious as Plaintiff claims. Plaintiff's arguments to the contrary, Pl.'s Reply & Resp. at 13–15, are little more than disagreements with USCIS's decision not to credit the expenditures that he claimed.[12]

Although not entirely clear, Plaintiff seems to contend that USCIS acted improperly when it discounted the 2013 employment impact report on the basis that it claimed indirect jobs based on the construction and development phases of the project. To support this argument, Plaintiff points to statements in the RFE. CAR

---

[12] Plaintiff correctly notes that the amount of expenditures stated in the body of USCIS's decision, $736,036, differs from the sum of expenditures in the table ($662,432). But as the table indicates, the expenditures in the table were adjusted using the 2006 Consumer Price Index, the same adjustment that Plaintiff used in the 2013 impact report. CAR at 734.

at 15; *see* Pl.'s Reply & Resp. at 15–17. There is no indication, however, that USCIS's denial of the I-829 petition was based on this ground. CAR at 9.

Even assuming *arguendo* that it was, however, USCIS's refusal to rely upon a job counting methodology employed at the I-526 stage for the purpose of deciding Plaintiff's I-829 petition would not be arbitrary or capricious in the context of this record. Although Plaintiff is correct to point out that USCIS had approved I-526 petitions for other investors who had relied on indirect job creation from construction and development phases, USCIS's EB-5 policy memorandum explains that "changed circumstances which are material may prevent deference from being accorded to [a] prior determination and a more extensive review will need to be conducted at the Form I-829 stage." CAR at 72; *see also id.* at 69. USCIS could not have been clearer in finding that a material change in circumstances had occurred from the time Plaintiff's I-526 petition (and other I-526 petitions) was filed. *Id.* at 8, 15. Thus, it would have been reasonable for USCIS to require Plaintiff to submit additional evidence to meet his burden to show that he had satisfied the job creation requirement.

For all of these reasons, USCIS's decision to deny Plaintiff's I-829 petition on the basis that he did not demonstrate his compliance with the EB-5 program's job creation requirement by a preponderance of the evidence was not arbitrary and capricious.

## C.    Preponderance of the Evidence Test

With the foregoing analysis in mind, the Court can quickly dispose of Plaintiff's argument that USCIS held him to a higher standard of proof than preponderance of the evidence.  As an initial matter, USCIS expressly stated that it was applying a preponderance of the evidence standard in evaluating Plaintiff's I-829 petition.  CAR at 4, 9.  And based on its reasoning, there is no indication that USCIS did otherwise.  Plaintiff's arguments do little more than disagree with USCIS's credibility determinations, weighing of the evidence, and ultimate decision. *Cassell v. Napolitano*, No. 12-CV-9786, 2014 WL 1303497, at *8 (N.D. Ill. Mar. 31, 2014) (rejecting a claim that USCIS applied a standard higher than preponderance of the evidence in similar circumstances and concluding that the claim "merely reflect[s] Plaintiffs' disagreement and disappointment with the agenc[y's] evaluation of the evidence").

For all of these reasons, Defendants' motion for summary judgment on Plaintiff's § 706(2)(A) claims is granted.

## II.    Section 706(2)(C) Challenge

Next, Plaintiff seeks to set aside USCIS's decision on the ground that USCIS exceeded its regulatory authority.  *See* 5 U.S.C. § 706(2)(C) (court must set aside decisions that are made "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

Plaintiff contends that USCIS's decision violated § 706(2)(C) in two ways. First, Plaintiff repeats his argument that USCIS applied a standard of proof higher than preponderance of the evidence. This argument has been rejected.

Plaintiff also argues that USCIS exceeded its authority "by requiring Plaintiff to provide evidence not appropriate for consideration as a pre-condition for approval of Plaintiff's I-829." Pl.'s Mem. Supp. Summ. J. 17, ECF No. 17.[13] In short, Plaintiff asserts that it was improper for USCIS to request an explanation of the land transaction and EMC's use of EB-5 investor funds, as well as a revised timeline for the facility's completion. *Id.* at 17–18. Plaintiff provides no authority that suggests USCIS cannot request such evidence, all of which appear relevant to USCIS's inquiry. Rather, the gist of Plaintiff's argument is that USCIS should have decided in his favor even without this evidence. But this is just another request that the Court revisit USCIS's weighing of the evidence that led to the denial. For the reasons explained above, such a *de novo* review is inappropriate. Defendants' motion for summary judgment on Plaintiff's § 706(2)(C) claims is granted.

---

[13] In passing, Plaintiff also states that "if this Court were to find that the considerations derived from the four legacy INS precedent decisions exceed the substantive restrictions of § 1153(b)(5) and 8 C.F.R. § 216.6, those considerations are irrelevant, and Defendants' conclusions that result from those considerations must be set aside." *Id.* But Plaintiff does not identify what "considerations" USCIS derived from the "four legacy INS precedent decisions." More importantly, Plaintiff does not explain why considerations derived from the decisions would exceed USCIS's authority. This undeveloped argument is therefore waived. *Cisneros*, 846 F.3d at 978.

## III. Constitutional Claims

Finally, Plaintiff argues that USCIS's decision violated his right to procedural due process and was issued in retaliation for exercise of his First Amendment rights.[14] Neither is meritorious.

Plaintiff contends that USCIS violated his procedural due process rights by (1) applying a standard higher than preponderance of the evidence, and (2) failing to consider all the relevant evidence. Pl.'s Mem. at 18–20. But these arguments merely rehash the arguments that have been previously rejected herein and cannot establish a procedural due process claim. *See Ogbolumani*, 557 F.3d at 735–36 (rejecting procedural due process claims where plaintiffs did "nothing more than dress[] up their claims under the Administrative Procedure Act as constitutional violations").

Plaintiff's First Amendment retaliation claim arises from a petition for a writ of mandamus that Plaintiff filed to compel USCIS's decision on his petition prior to its issuance. Pl.'s Mem. at 15, 18. Plaintiff filed for the writ on June 20, 2014, approximately six months before USCIS issued its decision. *Id.* at 16; *see* Am. Compl. ¶ 87. Plaintiff contends that the true motivation for USCIS's decision was to retaliate against him for seeking the writ, rather than for failing to comply with

---

[14]    Although Plaintiff presents these claims as additional ways that USCIS acted arbitrarily and capriciously and exceeded its statutory and regulatory authority, they perhaps are better characterized as arguments that USCIS's decision was "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

the EB-5 program's requirements.[15] While Plaintiff styles this contention as arising under the APA, *id.* at 15, 18, he presents it by way of the typical elements of a First Amendment retaliation claim, *id.* at 5. These elements are: (1) constitutionally protected speech; (2) a deprivation likely to deter such speech; and (3) causation, *i.e.*, that the protected speech was a motivating factor in causing the deprivation. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

The parties do not dispute that Plaintiff's claim satisfies the first two elements. In regard to the third element, Plaintiff points to two circumstances as evidence of causation. First, he points to the time that USCIS took to issue its decision, which he asserts was shorter than the average nationwide processing time. *Id.* at 16. Temporal proximity by itself is typically insufficient to permit an inference of causation in retaliation claims, *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015), and the amount of time that passed between the filing of the mandamus suit and USCIS's decision is longer than what the Seventh Circuit has held can permit such an inference. *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) (observing that "matters occurring within days, or at most, weeks of each other" might support an inference of retaliation, but that where "months separated the alleged protected activity and adverse action," retaliation

---

[15] Confusingly, Plaintiff also states that he "is not asserting that Defendants' actions violate his rights under the First Amendment," but "is asserting that Defendants' denial of Plaintiff's I-829 was an act by Defendants to adjudicate Plaintiff's I-829 as soon as possible[] without considering all evidence in the record and following USCIS procedure." Pl.'s Mem. at 15. If this is so, he defeats his own First Amendment–based claim. He cannot "dress[] up" APA claims as a First Amendment claim, just as he cannot as a procedural due process claim. *See Ogbolumani*, 557 F.3d at 735–36.

could not be inferred).  In any case, permitting Plaintiff to maintain a retaliation claim solely based on the fact that USCIS responded to his mandamus suit by processing his I-829 petition more quickly than average would encourage USCIS to do exactly the opposite of what his mandamus suit sought.  Given Plaintiff's argument about the importance of mandamus suits, Pl.'s Mem. at 15, this would be an odd result.

The other circumstance Plaintiff presents as indicative of retaliation is that "Defendants ignored their own adjudicating economist's recommendation to issue a Notice of Intent to Deny." *Id.* at 16.  But Plaintiff does not argue that USCIS was under any obligation to issue a notice of intent to deny, and his argument ignores the fact that USCIS denied his petition in large part based on reasons identified in its RFE.  Thus, USCIS's refusal to issue a notice of intent to deny does not indicate a retaliatory motive.

Ultimately, there is no evidence in the record that would suggest USCIS denied Plaintiff's I-829 petition because of his mandamus suit.  Rather, USCIS's decision provided various reasons why it concluded Plaintiff had not satisfied the requirements of the EB-5 program.  Accordingly, Defendants' motion for summary judgment on Plaintiff's First Amendment claim is granted.

## **Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment [82] is granted and Plaintiff's motion for summary judgment [78] is denied. Civil case terminated.

**IT IS SO ORDERED.**         **ENTERED**    3/28/17

_____

**John Z. Lee**
**United States District Judge**